UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE J. CORONADO,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:13-cv-01784 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT CAROLYN COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF JOSE CORONADO |

Plaintiff Jose Coronado asserts he is entitled to benefits under Titles II and XVI of the Social Security Act, and seeks judicial review of the decision denying his applications. Plaintiff argues the administrative law judge ("ALJ") erred in evaluating the medical evidence. Because Plaintiff fails to meet the burden to demonstrate his impairment satisfies Listing 1.04 and any error in rejecting the opinion of Dr. Pliam is harmless, the administrative decision to deny Plaintiff's applications for benefits is **AFFIRMED**.

**PROCEDURAL HISTORY**

Plaintiff filed applications for disability insurance benefits and supplemental security income in February 2007, alleging disability beginning June 1, 2006. (Doc. 10-6 at 2, 8.) The Social Security Administration denied his claims initially and upon reconsideration. (Doc. 10-4.) After requesting a hearing, Plaintiff testified before an ALJ on June 25, 2008. (Doc. 10-3 at 25.) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on October 1, 2008. (*Id.* at 16-22.) His

request for review by the Appeals Council was denied on August 3, 2009.  (*Id.* at 4.)

Plaintiff filed a second application for disability insurance benefits and a period of disability on October 26, 2009, alleging disability beginning September 27, 2008.  (Doc. 10-12 at 43-44, 48.)  These claims were also denied by the Social Security Administration initially and upon reconsideration.  (*Id.* 48.)  Plaintiff again requested a hearing, and he testified before an ALJ on June 30, 2011.  (*Id.*; Doc. 10-9 at 77.)  The ALJ determined Plaintiff was not disabled and issued an order denying the second claim on August 10, 2011.  (Doc. 10-12 at 45.)

While Plaintiff's second application was pending before the ALJ, he appealed the decision on his first application to the United States District Court, Eastern District of California, Case No. 10-cv-00594-AWI-SKO.  The Court determined the ALJ erred in assessing the medical record and evaluating Plaintiff's credibility.  (Doc. 10-9 at 22-42.)  Accordingly, the matter was remanded for further proceedings on September 1, 2011.  (*Id.* at 22.)

In light of the remand from the District Court and Plaintiff's request for review of the decision related to his second application, the Appeals Council associated the claims filed in 2007 with the claims filed in 2009.  (Doc. 10-9 at 18.)  The Appeals Council vacated the decisions issued on both applications and remanded the combined cases to an ALJ for further proceedings, as ordered by the District Court.  (*Id.* at 18-19.)

Plaintiff testified for a third time before an ALJ on July 26, 2012.  (Doc. 10-9 at 45.)  The ALJ concluded Plaintiff was not disabled and issued an order denying his applications for benefits on September 7, 2012.  (Doc. 10-12 at 7-23.)  The Appeals Council denied Plaintiff's request for review of this decision on September 16, 2013.  (Doc. 10-9 at 2-5.)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal

standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must

consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.     Relevant Medical Evidence**

Plaintiff sought treatment from Drs. Raissa Hill and San Tso on February 4, 2005, for complaints of pain in his right leg from which he had suffered for the past month.  (Doc. 10-8 at 61.) Dr. Tso ordered an x-ray of Plaintiff's right knee and MRI of Plaintiff's lumbar spine.  (*Id.* at 72, 74.) Dr. Hamid Javaherian determined Plaintiff had bulging discs "with association spondylotic changes" at the L2-3, L3-4, L4-5, and L5-S1 levels.  (*Id.* at 72.)  In addition, Plaintiff had central canal stenosis at the L2-3 and L4-5 levels, and disc desiccation at the L3-4, L4-5 and L5-SI levels.  (*Id.*)  According to Dr. Javaherian, Plaintiff had "[m]ultilevel foraminal stenosis as a result of degenerative changes." (*Id.* at 73.)  Dr. Geroge Khoury determined the x-ray showed Plaintiff had "[m]inimal medial joint compartment narrowing" and a possible joint effusion in his knee.  (*Id.* at 74.)

In February 2005, Plaintiff visited the Orthopedic Clinic of the San Joaquin General Hospital regarding the pain in his low back and right leg.  (Doc. 10-15 at 3.)  Dr. Stephen Gaal noted Plaintiff said his pain was a 3 out of 10, with a 10 being the "worse possible pain."  (*Id.* at 3, 4.)  Dr. Gaal recommended Plaintiff continue with conservative treatment.  (*Id.* at 3.)

Dr. Hill referred Plaintiff to Dr. F. Karl Gregorius, who examined Plaintiff for the first time on March 23, 2005.  (Doc. 10-8 at 5.)  Dr. Gregorius observed that the MRI of Plaintiff's lumbar spine showed "a congenitally narrowed spinal canal with short pedicles a "superimposed herniated disc at the L4-5 segment with lateral recess narrowing bilaterally," and "severe foraminal stenosis at the L5-S1 segment."  (*Id.*)  Plaintiff reported his pain was "a 4/10 and localized to his lumbar spine," and "[h]e no longer [had] right leg pain."  (*Id.*)  Dr. Gregorius found Plaintiff had "a full range of motion" in his cervical spine and could "flex the lumbar spine to $100^0$ and extend to $+10^0$."  (*Id.*)  Plaintiff's straight leg raising test results were negative.  (*Id.*)

On May 4, 2005, Dr. Gregorius noted Plaintiff reported having "no pain in the leg any longer." (Doc. 10-8 at 4.)  According to Dr. Gregorius, Plaintiff said he had "a constant, burning sensation in the lumbar spine and right paraspinous muscles [were] burning."  (*Id.*)  Plaintiff also reported "burning in the shoulders, on both sides" and his "right great toe [was] dead and numb."  (*Id.*)  Dr. Gregorius noted Plaintiff had gone to physical therapy, and Dr. Gregorius was "hopeful that his lumbar spine burning

4

pain will improve." (*Id.*)  Dr. Gregorius determined Plaintiff was able to flex and extend his lumbar spine "with minimal discomfort." (*Id.*)  Plaintiff's straight leg raising test results were negative. (*Id.*)  Dr. Gregorius believed Plaintiff should "look for another line of work" because he could not "go back to lifting, bending, and stooping." (*Id.*)

On August 31, 2005, Dr. Gregorius observed Plaintiff was walking "with an antalgic gait." (Doc. 10-8 at 6.)  Plaintiff "continu[ed] to complain of dysesthesias in his right great toe, weakness in the right great toe, and an inability to work." (*Id.*)  He reported having "a tingling sensation down the right leg all the time." (*Id.*)  Dr. Gregorius "discussed the possibility of surgery" with Plaintiff, who said he was not interested and that he "ha[d] seen a consultant in Mexico who advised him against having surgery." (*Id.*)  Plaintiff's "[s]traight leg raising [was] positive on the right and negative on the left." (*Id.*)  Dr. Gregorius opined that because Plaintiff did not want to consider surgery he was "permanently, totally, and completely disabled from any occupation." (*Id.*)

Dr. Nathan Pliam performed an orthopedic evaluation on April 26, 2007. (Doc. 10-8 at 9.)  Plaintiff told Dr. Pliam he "had problems with his low back since 2004," which was injured when he was "doing heavy lifting" at work. (*Id.*)  Dr. Pliam observed that Plaintiff was able to sit and stand "with normal posture" and "arise from a chair without difficulty." (*Id.* at 10.)  According to Dr. Pliam, Plaintiff walked normally and could "walk on his toes slowly with some apparent discomfort." (*Id.* at 11.)  Plaintiff said he was "unable to walk on his heels due to heel pain." (*Id.*)  Dr. Pliam determined Plaintiff's range of motion was normal in his cervical spine, but limited in his lumbosacral spine. (*Id.*)  In addition, Dr. Pliam determined Plaintiff had "diffuse tenderness about the lower lumbar spine and lumbosacral junction," and "mild to moderate muscle spasm about the right paraspinus musculature in the lumbar region." (*Id.*)  The "[s]traight leg raise [was] negative, bilaterally." (*Id.*)  Dr. Pliam found "no weakness" in Plaintiff's upper and lower extremities. (*Id.* at 12.)  Dr. Pliam concluded:

> The claimant should be limited to lifting 20 pounds, occasionally and 10 pounds respectively.  Bending should be limited to occasional.  Sitting should be limited to two hours continuously for a cumulative total of 6 hours per day.  Standing in one place should be limited to 30 minutes, continuously for a cumulative total of 20 hours per day.  The claimant should be precluded from posturally demanding activities such as crouching, crawling, squatting, climbing, etc.

(*Id.* at 13.)

1    Dr. J.M. Meek completed a residual functional capacity assessment on May 8, 2007.  (Doc. 10-8 at 17-22.)  Dr. Meek noted Plaintiff had lumbar spondylosis at multiple levels, but there were no documented neurologic deficits.  (*Id.* at 17-18.) According to Dr. Meek, Plaintiff was able to lift and/or carry 10 pounds frequently 20 pounds occasionally; sit about six hours in an eight-hour workday; stand and/or walk about six hours in an eight-hour workday; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl.  (*Id.* at 18-20.)  Dr. Meek opined Plaintiff should "[a]void all climbing of ladders, ropes or scaffolds due to lumbar spasm and tenderness, decreased [range of motion] on lumbar spine, and imagining studies showing Multi-level lumbar degeneration."  (*Id.* at 20.)  Plaintiff did not have any visual, manipulative, environmental, or communicative limitations.  (*Id.* at 20-21.)  Dr. Leonore Limos affirmed this assessment on October 15, 2007.  (Doc. 10-8 at 33.)

On January 4, 2008, Plaintiff visited Dr. Tso complaining of cold symptoms and "worsening pain radiating to left leg in [the] last few months."  (Doc. 10-8 at 43.)  Dr. Tso recommended Plaintiff continue with stretches and pain management, and noted he would refer Plaintiff to physical therapy "for overall strengthening."  (*Id.*)  In April 2008, Plaintiff reported to Dr. Tso that he "continue[d] to have bilateral knee pain" and numbness in his left leg.  (*Id.* at 40.)  Dr. Tso noted Plaintiff's back pain was "stable" and refilled Plaintiff's pain medication.  (*Id.*)

In October 2008, Plaintiff reported he was "having pain [in] his knees" after a vacation in Mexico during which "he was walking a lot."  (Doc. 10-15 at 53.)  Plaintiff said he had "numbness to his right and left legs when he walked" but "he took naproxen and [was] better."  (*Id.*)  Dr. Tso noted Plaintiff had "period exacerbations – which seem to be worsening – with his back pain."  (*Id.* at 54.)

On March 6, 2009, Plaintiff visited Dr. Gregorius for the first time in "about 4 years."  (Doc. 10-15 at 10.)  Dr. Gregorius noted Plaintiff "continue[d] to have severe lumbar spine with . . . bilateral radicular pain."  (*Id.*)  He observed that Plaintiff's "toe extensor weakness on the right side which was present 4 years ago ha[d] . . . progressed to a foot drop on the right," and Plaintiff had "no movement of the right toes or foot."  (*Id.*)  Further, Plaintiff reported his left leg went numb and became weak when he walked, and that he was unable to complete a stress test because he was unable to ambulate.  (*Id.*)  Dr. Gregorius noted Plaintiff had "diminished pinprick in the right foot . . . and his pinprick is normal on the left."  (*Id.*)  Plaintiff wanted to know if epidural injections would help, and Dr.

6

Gregorius informed him the injections were "unlikely to help . . . in view of the neurological deficit on the right side." (*Id.*) He again opined Plaintiff was "totally, completely, and permanently disabled from any type of work." (*Id.* at 11.)

      Dr. Tso completed a questionnaire regarding Plaintiff's impairments on March 13, 2009. (Doc. 10-15 at 13.) Dr. Tso noted Plaintiff had herniated discs, disc bulge, and degenerative disc disease with radiculopathy, and opined these impairments precluded Plaintiff from full-time work at any exertional level, including the sedentary level. (*Id.*) According to Dr. Tso, Plaintiff was able to sit, stand and/or walk for less than five minutes at a time. (*Id.*)

      Dr. Umer Malik conducted a comprehensive internal medicine evaluation on January 21, 2010. (Doc. 10-15 at 77.) Plaintiff told Dr. Malik that he "had severe back pain," which was "associated with both knee and both leg numbness and decreased sensation." (*Id.*) Plaintiff said "walking, sitting, lifting, and doing any work increases his back pain," which "radiated to both legs." (*Id.*) He reported that "he ha[d] been in bed for the last eight months for his back pain." (*Id.* at 78.) Plaintiff reported he was unable to bend over a counter; "sit too long;" or "do shopping, yard work, driving, vacuuming, mopping, laundry, dishes, or cooking because he cannot stand for too long." (*Id.*) He told Dr. Malik that he "use[d] a cane for an assistive device, given to him by his dad," although he did not take the cane to the consultative examination. (*Id.*) Dr. Malik observed that Plaintiff was able to "sit comfortably . . . without any problems" and "walk to the examination room without any assistance." (*Id.* at 79.) Plaintiff's "gait was slow, but antalgic." (*Id.*) Plaintiff refused to hop or jump, or walk on his toes and heels because he did "not want to talk a risk." (*Id.*) Dr. Malik believed that there was not "a medical necessity of using any assistive device." (*Id.* at 80.) He gave Plaintiff straight leg raising tests, which were "[n]egative in the seated and supine positions." (*Id.*) Further, Dr. Malik determined Plaintiff's light touch and pinprick sensory exam showed his senses were "intact throughout upper and lower extremities." (*Id.* at 81.)

      On February 1, 2010, Dr. H. Estrin reviewed the record, and noted that Plaintiff exhibited "[p]oor effort" at the consultative examination. (Doc. 10-15 at 76.) Dr. Estrin affirmed the ALJ's assessment from 2008 that Plaintiff was able to perform light work, with postural limitations. (*Id.*) Specifically, Dr. Estrin believed Plaintiff was able to lift and carry 10 pounds frequently and 20

pounds occasionally; stand and/or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (*Id.* at 84-85.) Also, Dr. Estrin believed Plaintiff was limited in his ability to push and pull foot controls. (*Id.* at 84.)

In March 2010, Plaintiff told Dr. Tso that he had been having pain in his "right fore foot for about a month." (Doc. 10-15 at 99.) Plaintiff said he was "losing feeling to his foot." (*Id.*) Upon examination, Dr. Tso found "tenderness to forefoot and slight edema." (*Id.*) He referred Plaintiff to a podiatrist. (*Id.* at 100.)

Dr. William McDonald—the podiatrist to whom Plaintiff was referred—gave Plaintiff a cortisone injection. (Doc. 10-15 at 113.) In May 2010, Plaintiff reported that "the injection helped for a short time but within a week the pain had returned." (*Id.*) Dr. McDonald determined Plaintiff had "slight bunion deformity with the tibial sesamoid in position 4/7," which "mean[t] that the fibular sesamoid is half on and half off the metatarsal." (*Id.*) Dr. McDonald added Cluffy Wedges to Plaintiff's shoes, which he hoped would "realign the sesamoid slightly" and resolve Plaintiff's pain. (*Id.*) At a follow-up appointment in June 2010, Dr. McDonald noted: "Unna boot applied to the R and L feet to stabilize the foot," and that Plaintiff "felt relief of all symptoms just with that wrapping." (*Id.*)

Dr. Dale Van Kirk, an orthopedic surgeon, conducted a comprehensive orthopedic evaluation and completed a medical source statement on April 19, 2012. (Doc. 10-16 at 24-35.) Dr. Van Kirk observed that Plaintiff sat "comfortably in the examination chair," walked around the examination room and got "on and off the examination table without difficulty." (*Id.* at 32.) However, Plaintiff walked "very slowly." (*Id.*) Dr. Van Kirk determined Plaintiff's straight leg raise was "90/90 degrees in the seated and supine positions." (*Id.* at 34.) Further, he found Plaintiff's motor strength was "5/5 in upper and lower extremities bilaterally" and "[l]ight touch and pinprick [were] intact throughout the upper and lower extremities bilaterally." (*Id.*) Dr. Van Kirk opined Plaintiff "should be able to lift and carry 25 pounds frequently and 50 pounds occasionally." (*Id.*) In addition, he opined Plaintiff was able to sit, stand, or walk for one hour at a time without interruption or a total of six hours each in an eight-hour day. (*Id.* at 25.) Dr. Van Kirk opined Plaintiff did not need a cane to ambulate, and could continuously use his feet to operate foot controls. (*Id.* at 25-26.) According to Dr. Van Kirk, Plaintiff was able to walk a block at a reasonable pace on rough or uneven surfaces; travel without a companion;

and ambulate without using a wheelchair, walker, or 2 canes or 2 crutches. (*Id.* at 29.)

Plaintiff had another MRI of his lumbar spine taken on April 16, 2012. (Doc. 10-16 at 46-47.) Dr. Benjamin Covington, Jr., determined there was "increased disk extrusion" on the right side at the L5-S1 level, "moderately severe spinal stenosis" at the L2-3 level, and "severe nerve root crowding within thecal sac" at the L3-4 and L4-5 levels." (*Id.* at 47.)

In June 2012, Dr. Gregorius treated Plaintiff for the first time in "approximately 3 years." (Doc. 10-16 at 44.) Plaintiff complained that his back pain was "a 7 to 8/10," his "right knee pain [was] a 7 to 8/10," and his "left radicular posterolateral pain [was] a 5 to 6/10." (*Id.*) Dr. Gregorius noted that Plaintiff could not "get on and off the examining table without pain," and walked "with an antalgic gait." (*Id.*) Dr. Gregorius explained Plaintiff "sort of wobbles from one leg to the other as he ambulates because he has pain with weightbearing in either leg." (*Id.*) According to Dr. Gregorius, Plaintiff's "reflexes [were] unattainable in the lower extremities," and his straight leg raising test results were "negative bilaterally." (*Id.*) He opined Plaintiff was "totally, completely, and permanently disabled without or with surgery." (*Id.*) Dr. Tso agreed with this assessment on August 8, 2012. (*Id.* at 48.)

**B.  Administrative Hearing Testimony**

   1.   June 25, 2008

Plaintiff reported he had back pain, "a dead toe," arthritis in his right knee, and numbness in his legs. (Doc. 10-3 at 27, 29.) He testified that he "gained 20 to 30 pounds" due to "[l]ack of movement, lack of exercise, lack of work." (Doc. 10-3 at 26-27.) He said he last worked in 2006 remodeling a house. (*Id.* at 27.) However, Plaintiff said he was "[u]nable to finish that job" and was "basically fired" because he was unable to do the work. (*Id.* at 27.)

Plaintiff explained he had constant pain in his back, which he described as "suffocating" and "streaks of pain going down [his] leg, pressure on the back." (Doc. 10-3 at 30.) He explained that on average, the pain was a "five, six" out of 10 with medication, but without medication the pain "goes to 10." (*Id.* at 31.) Plaintiff said the pain in his right foot "[c]omes and goes daily." (*Id.*)

He estimated he was able to be on his feet for "20, 30 minutes" at one time. (Doc. 10-3 at 31.) Plaintiff believed the heaviest thing he could lift was 10 pounds. (*Id.* at 32.) Plaintiff said he would lie down or elevate his legs "every hour, for a little while," for a total of about "[s]ix to seven hours" each

day. (*Id.* at 32-33.) Plaintiff testified that he did not use braces, crutches, or a cane. (*Id.* at 33.)

Vocational expert Stephen Schmidt testified after Plaintiff, and characterized his past relevant work as "maintenance/repair," which was classified as medium work in the *Dictionary of Occupational Titles*[1], but performed at the heavy exertional level by Plaintiff. (Doc. 10-3 at 37.)

The ALJ asked Schmidt to assume "a person of the same age, education, and work experience as the claimant." (Doc. 10-3 at 38.) Further, the ALJ set forth physical limitations for Schmidt's consideration, including "that the person could lift occasionally 20 pounds, frequently 10; stand or sit about six hours in an eight-hour day; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; but never climb ladders, ropes, or scaffolds." (*Id.*) Schmidt opined such a person was unable to perform Plaintiff's past relevant work. (*Id.*) However, Schmidt testified the hypothetical worker was able to perform other light work existing in the national or regional economy including: cashier, *DOT* 211.462-010; garage attendant, *DOT* 915.473-010; and information clerk, *DOT* 237.367-018. (*Id.*)

Next, Plaintiff's counsel asked Schmidt to consider a person with the limitations set forth by Dr. Pliam in Exhibit 2F. (Doc. 10-3 at 38.) Specifically, Schmidt was asked to consider an individual limited to lifting "20 [pounds] occasionally, 10 pounds repetitively; bending limited to occasional; sitting limited to two hours continuously, for a cumulative total of six hours per day; standing in one place limited to 30 minutes continuously, for a cumulative total of two hours per day; precluded from posturally [sic] demanding activities such as crouching, crawling, squatting, climbing, et cetera." (*Id.* at 38-39.) Schmidt testified that such a person could perform the previously identified jobs, but the number of available positions for the cashier would be "eliminated or eroded to 15,000 cashier jobs" and the number of information clerk jobs would be eroded to 3,000. (*Id.* at 39.) Schmidt explained there would be no erosion for the number of garage attendant positions, which totaled 10,000 jobs. (*Id.* at 38-39.)

Schmidt said that if the person could tolerate "no more than six hours sitting" and "standing

---

[1] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan,* 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1).

had to be limited to two hours per day maximum," the garage attendant position could not be performed because it did not allow for that much flexibility. (Doc. 10-3 at 40.) However, Schmidt believed such as worker could perform the information clerk and cashier positions. (*Id.*)

### 2. June 30, 2011

Plaintiff testified that his condition was worsening, and he "lost the feeling on [his] right foot" and was "starting to lose the feeling on [his] left." (Doc. 10-9 at 80-81.) He said he had constant "stabbing" pain in his lower back, and bending, "[p]rolonged standing, prolonged sitting, [and] any kind of lifting" caused his pain to increase. (*Id.* at 82-83.) He estimated he was able to stand or sit in the same position for "10, 15 minutes" at one time. (*Id.*) Plaintiff reported he had to lie down "10, 12 times a day" and elevate his feet for "10, 15 minutes" each time. (*Id.* at 84.) Plaintiff explained that staying in one position for too long caused his pain to "get[] worse and worse." (*Id.* at 85.)

Vocational expert George Meyers testified after Plaintiff at the hearing. (Doc. 10-9 at 95.) He also explained that Plaintiff's past relevant work in maintenance repair was defined as medium work in the *DOT*, but was performed by Plaintiff "in the heavy work category." (*Id.* at 96.) In addition, Meyers noted that Plaintiff had past relevant work as a drywall applicator, *DOT* 842.361-030, which was very heavy and skilled work. (*Id.* at 97.)

The ALJ asked Meyers to consider "a person of the claimant's age, education, and work experience who is able to perform work at the light exertional level." (Doc. 10-9 at 98-99.) The worker could not climb "ladders, ropes or scaffolds," and was limited to occasionally "climbing of ramps, stairs, balancing, stooping, crouching, kneeling, and crawling." (*Id.* at 99.) Meyers opined such a person could not perform Plaintiff's past relevant work, but could perform other light unskilled work such as "assembler of small products, *DOT* number 706.684-022." (*Id.*)

Next, the vocational expert considered a person who, in addition to the above postural limitations, was limited to "occasional bilateral foot control operation." (Doc. 10-9 at 99.) Meyers testified that such a person would be able to perform the work as a small products assembler. (*Id.*)

### 3. July 26, 2012

Plaintiff reported his pain medication caused drowsiness and made him "fall asleep a lot." (Doc. 10-9 at 48.) He explained he could be "sitting there reading a book or just sitting there listening

to conversations at the house or something" and he would "just doze off." (*Id.*) In addition, Plaintiff said he felt "more nauseated" when he took medicine. (*Id.* at 49.)

The ALJ asked vocational expert Kenneth Ferra to "assume a person of the claimant's age, education, and work experience who is capable of performing work at the light exertional level." (Doc. 10-9 at 53-54.) In addition, "this person may no more than occasionally climb ramps and stairs, may never climb ladders, ropes, or scaffolds; and then occasionally balance, stoop, kneel, crouch, and crawl." (*Id.* at 54.) Ferra testified such a person could not perform Plaintiff's past relevant work, but could perform other work "[a]t the light, unskilled level" such as cashier, *DOT* 211.462-010; cleaner housekeeping, *DOT* 323.687-014; and packing line worker, *DOT* 753.687-038. (*Id.*)

Plaintiff's counsel asked Ferra to consider a person who, in addition to the postural limitations set forth by the ALJ, was "limited to being on the feet . . . no more than six hours a day." (Doc. 10-9 at 56.) Ferra testified, "the packing line worker and the cleaner would not be compatible" with these limitations but "there would be some cashier positions that would allow an individual to sit." (*Id.*) Ferra explained there would be approximately a 90 percent erosion of the number of cashier jobs. (*Id.*)

**C.  The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after 2006. (Doc. 10-12 at 13.) Second, the ALJ found Plaintiff "has the following severe impairments: lumbar spondylosis, hypertension, and obesity." (*Id.*) These impairments did not meet or medically equal a Listing, including Listing 1.04. (*Id*. at 13-14.) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he can never climb ladders, ropes, and scaffolds. He can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. He is limited to occasional foot-controlled operation bilaterally. He should avoid concentrated exposure to dangerous moving machinery and unprotected heights.

(*Id.* at 14.) With this residual functional capacity ("RFC"), Plaintiff was unable to perform his past relevant work. (*Id.* at 21.) However, the ALJ determined "there were jobs that existed in significant numbers in the national economy that the claimant can perform." (*Id.* at 22.) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 22-23.)

///

## DISCUSSION AND ANALYSIS

Plaintiff argues the ALJ erred at step three of the evaluation when determining whether his back impairment satisfied Listing 1.04. (Doc. 17 at 10-14.) Further, Plaintiff contends the ALJ erred in evaluating the medical record, because the ALJ did not adopt all the limitations set forth by Dr. Pliam, and did not articulate reasons for doing so. (*Id.* at 14-16.) On the other hand, Defendant asserts that this Court previously determined "any error in the ALJ's consideration of Dr. Pliam's opinion was harmless in light of the limitations incorporated in the prior VE's testimony" and that "[t]he ALJ properly found that Plaintiff was not presumptively disabled under Listing 1.04." (Doc. 18 at 4-5, emphasis omitted.)

### A.     ALJ's evaluation of Listing 1.04

The Listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citation omitted, emphasis in original). At step three of the sequential evaluation, the claimant bears the burden of demonstrating that his impairments equal a Listing. *Bowen v. Yuckert*, 482 U.S. 137, 141, 146 n. 5 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d). "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." *Id.* at 141; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). Here, the ALJ determined Plaintiff's back impairment does not meet Listing 1.04 "because there is no evidence of root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in an inability to ambulate effectively, as defined in 1.00B2b." (Doc. 10-12 at 13.)

Listing 1.04 governs of musculoskeletal impairments and requires a claimant to show a disorder of the spine such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture[], resulting in a compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.04. The Supreme Court explained, "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530 (emphasis in original). Therefore, to meet his burden at step three, Plaintiff must demonstrate he meets the Listing requirements. In the

alternative, Plaintiff may show his condition "equals" Listing 1.04 with "symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics of [the] relevant listed impairment." *Tackett*, 180 F.3d at 1099 (quoting 20 C.F.R. § 404.1526).

### 1.     ALJ's analysis of the medical record

As an initial matter, Plaintiff contends that the ALJ was required to discuss this medical evidence at step three, and argues the ALJ failed to explain why the evidence "was insufficient to meet the listing." (Doc. 17 at 3, citing *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006)). According to Plaintiff, the "failure to provide a proper analysis of Plaintiff's back impairment at Step Three was error warranting remand." (*Id.*, citing *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).

Importantly, the Ninth Circuit has rejected the argument that an ALJ must discuss all the medical record at step three of the sequential evaluation where the ALJ discusses the medical evidence elsewhere in the opinion. The Court explained in *Gonzalez v. Sullivan* that "[i]t is unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every different section of the listing of impairments." *Id.*, 914 F.2d 1197, 1201 (9th Cir. 1990). The Court found the ALJ's "four page 'evaluation of the evidence' [was] an adequate statement of the 'foundations on which the ultimate factual conclusions are based.'" (*Id.*)  Similarly, here the ALJ gave a six-page evaluation of the medical record between steps three and four in support of the residual functional capacity determination. (Doc. 10-12 at 15-21.)  Thus, entirety of the medical record pertinent to the Listing need not have been summarized at step three. *See Gonzalez*, 914 F.2d at 1201. As the Ninth Circuit explained, "require[ing] the ALJ's to improve their literary skills in this instance would unduly burden the social security disability process." (*Id.*, citation omitted.)

### 2.     Listing 1.04(A)

Plaintiff argues the ALJ failed to consider evidence "that pertained to the criteria of Listing 1.04A. (Doc. 17 at 13.)  Specifically, paragraph "A" of Listing 1.04 requires:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.04(A). Plaintiff argues the ALJ erred in assessing his

14

back impairment because "[t]here was evidence of neuropathic pain, limited motion of the spine, muscle weakness, reflex loss, and positive straight leg raise." (Doc. 17 at 13, citing Doc. 10-8 at 6, 11; Doc. 10-16 at 43-44.)

Notably, in the evaluation of the medical evidence, the ALJ considered the results of Plaintiff's MRIs, and observed:

> An MRI of his lumbar spine dated February 16, 2005 showed: multilevel degenerative disc disease, spondylosis, facet arthropathy, and ligamentum flavum thickening; central canal stenosis at the L2-3 and L4-5 levels; broad-based disc herniation at the L4-5 level; multilevel disc desiccation; and multilevel foraminal stenosis (Exhibit 3F, 3). … An MRI dated February 19, 2009, which was mentioned in the medical report, found: foraminal disc herniation at L5 on the right side, which completely obliterated the right L5 nerve root; a disc extrusion at the L4-5 level on the left side causing compression of the left L5 nerve root; and moderate central stenosis at the L2-3 and L3-4 levels (Exhibit 2F). An MRI of his lumbar spine dated April 16, 2012 showed: increased disc extrusion at the L5-S1 level on the right side; prominent disc changes; moderately severe spinal stenosis at the L2-3 level, and severe root crowding at the L4-5 level (Exhibit 25F).

(Doc. 10-12 at 15.) Consequently, the ALJ properly considered evidence that showed Plaintiff had nerve root compression, despite Plaintiff's arguments to the contrary. However, these findings alone are not sufficient to demonstrate Plaintiff satisfies Listing 1.04A.

As noted by the ALJ, the record does not establish that Plaintiff had any sensory loss, though he had some reflex loss by 2012. Specifically, the ALJ noted that the "[s]ensory and motor strength examinations revealed no deficiency" when tested by Dr. Pliam in 2007. (Doc. 10-12 at 16.) Further, the ALJ observed that Dr. Malik found Plaintiff "had normal sensations to light touch and pinprick," and "[h]is deep tendon reflexes were normal" in 2010. (*Id.*) Finally, at the most recent consultative examination in 2012, Plaintiff's "sensations to light touch and pinprick were intact," although "[h]e had diminished deep tendon reflexes in the lower extremities." (*Id.* at 17.) Therefore, the ALJ concluded that Plaintiff's "sensory, motor strength were essentially normal during the consultative examinations. (*Id.* at 18.)

Moreover, Plaintiff does not identify medical evidence that demonstrates he meets or medically equals the requirement that he have "positive straight-leg raising test (sitting and supine)." *See* 20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.04(A). Plaintiff notes that he had a positive straight leg raising test in August 2005. (Doc. 17 at 5, citing Doc. 10-8 at 6.) Specifically, Dr. Gregorius noted Plaintiff's "[s]traight leg raising [was] positive on the right and negative on the left." (Doc. 10-8 at 6.)

Thus, it is not clear whether Dr. Gregorius administered the test in both the sitting and supine positions—as is required to meet Listing 1.04(A). On the other hand, as noted by the ALJ, Plaintiff's "straight leg raising tests were consistently negative from April 26, 2007 to June 1, 2012." (Doc. 10-12 at 18; *see also* Doc. 10-8 at 11 [in April 2007, Dr. Pliam found the straight leg raise was "negative, bilaterally"]; Doc. 10-15 at 80 [in January 2010, Dr. Malik found Plaintiff's straight leg raising tests were "Negative in the seated and supine positions"] Doc. 10-16 at 44 [in June 2012, Dr. Gregorius indicated straight leg raising test results were "negative bilaterally"]). Thus, Plaintiff has not carried his burden to establish his impairments meet or medically equal Listing 1.04(A). *See Sullivan*, 493 U.S. at 530.

### 3.     Listing 1.04(C)

In addressing the arguments presented by the Defendant, Plaintiff suggests that the ALJ erred in finding he did not satisfy the requirements of paragraph "C" of Listing 1.04. (*See* Doc. 19 at 3.) Paragraph "C' requires "[l]umbar spinal stenosis . . . resulting in an inability to ambulate effectively." 20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.04(C). Plaintiff notes that the ALJ found he walked with "an antalgic gait on January 21, 2010, June 1, 2012, and June 29, 2011." (Doc. 19 at 3, quoting Doc. 10-12 at 16.) Further, Plaintiff told Dr. Gregorius that he was unable to finish a stress test because he was unable to ambulate. (Doc. 10-15 at 10.) However, this evidence is insufficient to establish an "inability to ambulate" under Listing 1.04(C).

Under the Listings, the inability to ambulate effectively is defined as "an extreme limitation of the ability to walk," meaning that the claimant has "insufficient lower extremity functioning [citation] to permit independent ambulation without the use of a hand-held device(s) that limits the function of *both* upper extremities." 20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.00B(2)(b)(1) (emphasis added). "Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes . . ." *Id.*, Listing 1.00B(2)(b)(2). Here, as noted by the ALJ, Dr. Pliam observed that Plaintiff "ambulated normally" in 2007. (Doc. 10-12 at 16.) In addition, the ALJ noted that in 2010, Dr. Malik "observed that the claimant was able to walk to the examination room without any assistance," although his "gait was slow and antalgic." (*Id.*) Despite the fact that Plaintiff reported he used a cane to walk, "he did not bring it to the examination." (*Id.*) Similarly, the ALJ noted that at the most recent consultative examination in 2012, Plaintiff was able to

16

"move around the room without assistance, even though he moved slowly." (*Id.* at 17.) Further, both Dr. Malik and Dr. Van Kirk opined Plaintiff did not need a cane to ambulate, or require the use of another assistive device. (Doc. 10-15 at 80; Doc. 10-16. at 25-26, 29.) Consequently, the record supports the ALJ's conclusion at step three that Plaintiff fails to establish "an inability to ambulate effectively" as required under Listing 1.04(C).

**B.     Opinion of Dr. Pliam**

The ALJ gave the opinion of Dr. Pliam "great weight." (Doc. 10-12 at 19.) However, Dr. Pliam opined that Plaintiff "could stand in one place for 2 hours in an 8-hour workday, 30 minutes at a time" and "sit for 6 hours in an 8-hour workday, 2 hours at a time." (*Id.* at 18; *See also* Doc. 10-8 at 13.) In addition, Dr. Pliam believed Plaintiff was "limited to occasional bending" and "should be precluded from postural activities such as crouching, crawling, squatting, and climbing." (*Id.*) These limitations were not adopted by the ALJ, and were not incorporated into the RFC. Plaintiff contends the failure of the ALJ to neither adopt nor reject these limitations is a reversible error. (Doc. 17 at 14-16.)

Importantly, however, the vocational expert at the hearing held in 2008 was asked by Plaintiff's counsel to consider the limitations assessed by Dr. Pliam. (Doc. 10-3 at 38.) Specifically referring to "Exhibit 2F," Plaintiff's counsel asked Schmidt to consider an individual who was limited to lifting "20 [pounds] occasionally, 10 pounds repetitively; bending limited to occasional; sitting limited to two hours continuously, for a cumulative total of six hours per day; standing in one place limited to 30 minutes continuously, for a cumulative total of two hours per day; [and] precluded from posturally [sic] demanding activities such as crouching, crawling, squatting, climbing, et cetera." (*Id.* at 38-39.) Schmidt responded that a person with these limitations would be able to perform work as a cashier, information clerk, and garage attendant. (*Id.*) Schmidt explained the total number of cashier positions would be eroded from 90,000 to 15,000; and the number of information clerk positions would be eroded from 10,000 to 3,000. (*Id.* at 37, 39.) Thus, the vocational expert provided testimony that there were a significant number of jobs that Plaintiff was able to perform even with the postural limitations set forth by Dr. Pliam.

A vocational expert's testimony may be used to establish there are a significant number of jobs that a claimant is able to perform. *Martines v. Heckler,* 807 F.3d 771, 774 (9th Cir. 1987); *Matthews v.*

*Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).  Here, Schmidt testified that even with the limitation assessed by Dr. Pliam, Plaintiff would be able to perform work.  Consequently, any error by the ALJ in rejecting the limitations by Dr. Pliam is harmless, because the error does not affect the ALJ's ultimate disability conclusion.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

## CONCLUSION AND ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Jose Coronado.

IT IS SO ORDERED.

Dated:   **March 31, 2015**            **/s/ Jennifer L. Thurston**
                                       UNITED STATES MAGISTRATE JUDGE